IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| MARK BITZAN, | 4:15-cv-00217-JAJ-HCA |
| Plaintiff, | |
| vs. | |
| MARK ROBERTS, REBECCA BOWKER, MIKE SCHIERBROCK, JILL JOHNSON, DAVID DEGRANGE, BERL WILCOX, and MIKE EISNNICHER, | REPORT AND RECOMMENDATION |
| Defendants. | |

## I.     INTRODUCTION

This Report and Recommendation is issued following evidentiary hearings held by the undersigned on October 9, 2019 [79] and November 13, 2019 [82]. The evidentiary hearings were held pursuant to the Eighth Circuit Court of Appeals' partial remand of this case to deal with material disputes of fact relating to plaintiff Mark Bitzan's limited retaliation claims against defendants Berl Wilcox, Mike Eisnnicher, David DeGrange, Mike Schierbrock, Rebecca Bowker, Jill Johnson, and Mark Roberts. Following the hearing, counsel for Bitzan [88] and the defendants [87] submitted post-hearing briefs. The findings of fact in this Report and Recommendation are made by the undersigned on the basis of the exhibits [80], [81] and testimony [84], [89] presented at the two hearings.

## II.     PROCEDURAL HISTORY

Plaintiffs Mark Bitzan and Gary Buck filed this lawsuit on June 19, 2015. This lawsuit was filed after these plaintiffs voluntarily dismissed a previous case, *Hamby v. Schierbrock*, 4:14-cv-00162-JEG (hereinafter referred to as *Hamby*). In *Hamby*, "Bitzan, Buck, and another inmate [Lawrence Hamby] alleged prison officials violated their rights related to [the Religious Land Use and Institutionalized

Persons Act and the First Amendment]" as members of the Messianic Jewish Services Group at the Iowa State Penitentiary. (Prescreening Order [7] at 2).

*Hamby* was dismissed without prejudice on April 7, 2015, after the plaintiffs' counsel filed a response to a then-pending motion for summary judgment seeking voluntary dismissal. Counsel for the plaintiffs, Phillip Van Liew, asserted that voluntary dismissal of *Hamby* was warranted because the *Hamby* defendants, particularly Rebecca Bowker, took steps "to ensure that Plaintiffs could not deliver, either in person or through the mail system, the aforementioned documents" to Van Liew. (4:14-cv-00162-JEG, Pl. Response [41] ¶ 5).

In the instant lawsuit, Bitzan and Buck repleaded the same religious-based claims in *Hamby*, and also added retaliation claims against several defendants for actions allegedly taken to retaliate against Bitzan for the filing and participation in *Hamby*. Defendants moved for summary judgment on all of the plaintiffs' claims on November 11, 2016 [36]. Chief Judge Jarvey granted summary judgment to the defendants on all of the plaintiffs' claims on September 28, 2017 [46]. The plaintiffs appealed Chief Judge Jarvey's grant of summary judgment on October 28, 2017 [50].

The Eighth Circuit Court of Appeals affirmed the grant of summary judgment in part on February 26, 2019 [56]. The Eighth Circuit affirmed the grant of summary judgment on all claims, with the exception of Bitzan's retaliation claims against Schierbrock, DeGrange, Wilcox, Eisnnicher, Bowker, Roberts, and Jill Johnson. (Opinion [56-1] at 3). The Court remanded the case back to the district court to deal with these claims, stating:

> We conclude that a genuine issue of material fact remained, however, as to Bitzan's retaliation claims against Schierbrock, DeGrange, Wilcox, Eisnnicher, Bowker, Roberts, and Jill Johnson. Bitzan presented evidence these specific defendants placed him in administrative segregation and prevented him from providing his attorney with legal documents shortly after he filed a previous lawsuit against prison officials . . . and that they knew of the lawsuit.
>
> . . .

2

Rather than offering evidence justifying the adverse actions, the Appellees argued the actions Bitzan claims were retaliatory could not have been such since they occurred prior to the filing of the lawsuit. However, this is simply not the case. The administrative segregation occurred on or about May 7, 2014, and the lawsuit was filed on April 23, 2014.

(*Id.* at 3–4).

Chief Judge Jarvey referred the case to the undersigned on June 5, 2019 [58]. On June 19, 2019, the undersigned advised the parties that issues of material fact would be resolved through evidentiary hearing [64].

## III.    FINDINGS OF FACT

Bitzan has been incarcerated at the Iowa State Penitentiary since March 21, 2012. Bitzan filed *Hamby* on April 23, 2014. Only defendants Schierbrock, Bowker, and DeGrange were named as defendants in *Hamby*. Bitzan sent written messages during the week of April 23, 2014, to Schierbrock indicating in general terms that Bitzan had filed a lawsuit, and Schierbrock responded that he was unaware of any actual lawsuit and had not been served. (Def. Exhibits [80] at 23-25).

By May of 2014, Bitzan was working on three different lawsuits. (Transcript [84] at 102). At the very least, Bitzan stored the documents related to the *Hamby* suit in blue accordion folders. (Transcript [84] at 20). Bitzan frequently took his blue folders with him outside of his cell. (Transcript [84] at 27-28). Though Bitzan was one of three co-plaintiffs on the *Hamby* case, he was the plaintiff primarily filing grievances and generally getting the case filed and prepared. (Transcript [84] at 18). Bitzan did not hide the fact that he was preparing and taking the lead on the *Hamby* case. (Transcript [84] at 26).

On May 2, 2014, Lawrence Hamby sent a written message to defendant Jill Johnson, the administrative assistant to the Warden, regarding Schierbrock's earlier indications to Bitzan that he had not been served with the *Hamby* lawsuit. (Pl. Exhibits [81] at 1). Johnson, whose duties included being the point of contact for the Attorney General's office regarding prisoner lawsuits, responded on May 6,

2014: "Your case has not been served on any prison staff member. I verified that information yesterday." (Pl. Exhibits [81] at 1). Johnson "verified" the information by asking the Attorney General's office about the status of the lawsuit. (Transcript [84] at 231). She did not contact any *Hamby* defendants to notify them of the suit. (Transcript [84] at 175, 197); (Transcript [89] at 49).

On May 7, 2014, Bitzan was transferred from his general population cellhouse into investigative segregation. Bitzan's placement in investigatory segregation was initiated by nonparty Correctional Officer ("CO") Teneil Cangas and was approved by nonparty Shift Captain Dan George. (Def. Exhibits [80] at 3, 8-9). Cangas sent a message to George explaining that she had learned through a confidential informant that Bitzan and another inmate were attempting to entice other inmates to assault her. (Def. Exhibits [80] at 9). George indicated that he would be placing the two inmates into investigative segregation while an investigation was conducted due to the seriousness of the allegation. (Def. Exhibits [80] at 9).

Between the time George made the decision to transfer Bitzan and when Bitzan was actually transferred, Bitzan gave all of his *Hamby* related documents to co-plaintiff Gary Buck.[1] (Transcript [84] at 20, 27–28, 39). Thereafter, two unnamed, nonparty COs effectuated Bitzan's transfer. (Transcript [84] at 27). Bitzan testified that these COs asked where his blue accordion folder was before removing his bedding and "stripping him out" into new clothing. (Transcript [84] at 27). Bitzan was then transferred to investigative segregation. (Transcript [84] at 28–29). Officer Killoren performed an inventory of the

---

[1] There was some confusion as to whether Bitzan gave all of his *Hamby* documents to Buck, or instead retained some of them in his cell. Throughout the course of this case, and the beginning of his testimony, Bitzan insisted that he transferred "*literally all*" of his *Hamby* documents to Buck because he knew reprisal was coming and thus wanted to make sure the documents were in safe keeping. (Transcript [84] at 28) (emphasis added). Bitzan's about-face that he actually retained some of the *Hamby* documents in his cell, (Transcript [84] at 103–04), is not credible in light of his previous representations and explanations as to why he transferred his documents to Buck. Regardless, whether Bitzan did or did not retain some *Hamby* documents is immaterial based on other circumstances surrounding the custody of his documents and the defendants who allegedly deprived Bitzan of the documents.

4

property left behind in Bitzan's cell, and sent whatever property was allowed in investigative segregation to that unit for issuance to Bitzan. (Transcript [84] at 117). Legal work was permitted in investigative segregation, and an inmate could bring their legal work with them straight from their cell, rather than leaving it behind to be sorted and delivered to investigative segregation by prison staff. (Transcript [84] at 116, 118). Ten books in total also were permitted, so long as they were not hardbound.[2] (Transcript [84] at 118, 123). Hardbound books presented a security concern due to the ability for an inmate to hide items in the spine of the book. (Transcript [84] at 116).

Bitzan remained in investigative segregation from May 7, 2014, to May 30, 2014. On May 8, 2014, Defendant Dave DeGrange was assigned by the security director, nonparty Deb Nichols, to investigate Bitzan's alleged threats against Cangas. (Transcript [89] at 46). DeGrange was a grievance officer at the facility, who also had investigative duties. (Transcript [89] at 45). DeGrange interviewed Bitzan on May 8th in investigative segregation. Defendant Berl Wilcox, unit manager of the segregation unit, also was present for the interview. (Transcript [89] at 47). DeGrange conducted his investigation over the next several weeks and determined that there was no evidence to support the allegations made against Bitzan. (Transcript [89] at 48). At the end of his investigation, DeGrange recommended that Bitzan be released from investigative segregation. (Transcript [89] at 48).

While in segregation, Bitzan made several requests to have various religious materials in his cell and alerted staff that he was missing "half" of his legal documents. *See* (Pl. Exhibits [81] 3-6); (Def. Exhibits [80] at 5-7). Bitzan notified segregation staff of these issues through written communications and at his weekly segregation review meetings, which occurred on May 14, 21, and 28. (Def. Exhibits [80] at

---

[2] The undersigned notes that prison staff seem to use the terms "hardbound" and "hardback" interchangeably in this regard. *See, e.g.*, (Transcript [84] at 116, 123). Regardless of the specific term used, the evidence shows that there was indeed a policy against books with a spine because of the potential to hide contraband in the book.

5-7). Wilcox was present for the latter two review meetings. (Def. Exhibits [80] at 5-7). Defendant Mike Eisnnicher was the psychologist assigned to the segregation unit. (Transcript [84] at 132). Eisnnicher was present for all three review meetings. (Def. Exhibits [80] at 5-7). Eisnnicher, however, played no role in determining which property was allowed to inmates in segregation; his role was simply to provide mental health feedback. (Transcript [84] at 132).

Bitzan's request for his prayer book was initially denied by Wilcox on May 18, 2014, because it was deemed a hardback and thus was not allowed in segregation. (Pl. Exhibits [81] at 3); (Testimony [84] at 121-22). On May 20, 2014, Bitzan sent another written request to Wilcox for his Siddur and two other religious books. (Pl. Exhibits [81] at 4). Wilcox did not answer this request in writing. (Pl. Exhibits [81] at 3). Wilcox testified that he did not respond to this message because the request had already been denied, and that he would have dealt with the request at the review meeting scheduled for May 21. (Transcript [84] at 122). On May 26, 2014, Bitzan sent a written request to Wilcox for "all" of his legal work, noting that he had three lawsuits pending, and specifically providing the case number for *Hamby*. (Pl. Exhibits [81] at 6). Wilcox did not provide a written response, again noting that he likely would have just addressed the issue at the classification meeting two days later. (Transcript [84] at 123). At the May 28, 2014, review meeting, Bitzan voiced his same concerns and was again told that hardback books were not allowed. (Def. Exhibits [80] at 7). Wilcox also directed nonparty Lieutenant Clark to go to the property room and look for any of Bitzan's additional legal work that may have been stored in the room. (Transcript [84] at 119, 121); (Def. Exhibits [80] at 7). Wilcox testified that it was his understanding that no additional legal work was found. (Transcript [84] at 119).

On the morning of May 30, 2014, Bitzan was transferred out of investigative segregation and back into general population. Wilcox made the decision to release Bitzan after he was apprised that DeGrange had finished his investigation and cleared Bitzan of any wrongdoing. (Def. Exhibits [80] at 226). Wilcox

determined that Bitzan was eligible to be "returned to Tier 3" general population, where he was housed prior to being transferred into investigative segregation. (Def. Exhibits [80] at 226). Apparently Bitzan initially was released into Tier 2 general population, a more restrictive type of housing with less privileges than Tier 3, where he remained for several months before being placed back into Tier 3 population. (Transcript [84] at 35, 124). There is no evidence to show which prison official actually placed Bitzan in Tier 2 housing. With that said, Wilcox testified that it was common to have a long waiting list for inmates to get into Tier 3 because all of the cells were full, so it was common practice for an inmate to be placed in Tier 2 housing while they waited for an available cell in Tier 3. (Transcript [84] at 124). Bitzan was not informed as to why he was placed in Tier 2. (Transcript [84] at 69).

On the afternoon of May 30, 2014, Schierbrock responded to a message sent to him by Bitzan the day before asking Schierbrock to "overturn" Wilcox's denial of Bitzan's request for his Siddur and other religious texts. (Pl. Exhibits [81] at 7). Schierbrock was the Associate Warden of Treatment, and there is no evidence as to whether he had the authority to overturn Wilcox's decision. (Transcript [84] at 197). Schierbrock responded by stating: "The Siddur would be your prayer book. In your current status - Hard back books are not allowed. A soft back Siddur would be allowed." (Pl. Exhibits [81] at 7). Schierbrock was unaware that Bitzan had been released from investigative segregation at the time he sent this message. (Transcript [84] at 201-02).

On July 7, 2014, the Attorney General's Office sent an email to all of the *Hamby* defendants notifying them that they were named as defendants in the *Hamby* suit[3] and generally outlining the allegations in the lawsuit. (Def Exhibits [80] at 66). This followed the normal course for informing prison staff that they were named in a lawsuit. (Transcript [84] at 223). This is the first date that the *Hamby*

---

[3] Only Defendants Bowker, DeGrange and Schierbrock also were named as defendants in *Hamby*.

defendants in this case—DeGrange, Schierbrock, and Bowker—had actual knowledge of the *Hamby* suit. (Transcript [84] at 175, 197); (Transcript [89] at 49).

On August 7, 2014, attorney Phillip Van Liew accepted appointment as pro bono counsel on the *Hamby* case. Bitzan had documents pertaining to the *Hamby* case that he wanted to give to Van Liew. Unless an exception was granted, legal documents that prisoners wanted to send outside of the prison had to go through regular prison mail channels. (Transcript [84] at 141); (Def. Exhibits [80] at 33). The standard procedures for an inmate to mail out their documents was to submit the documents to one of the regular COs in the housing unit who would seal it and send it[4] off to the mailroom for processing before being sent to the U.S. Postal Service for delivery (Transcript [84] at 39). Bitzan could have sent his documents to Van Liew through the regular prison mail channels at any time. (Transcript [84] at 88). Bitzan was reticent to use the regular channels because he was suspicious that staff would tamper with the documents. (Transcript [84] at 40, 74). None of the defendants were regular COs in Bitzan's housing unit or employed in the mailroom.

On October 3, 2014,[5] Bitzan met with Phillip Van Liew and his father, Fred Van Liew (who was also an attorney, but not an attorney of record in the *Hamby* case), in the visiting room of the prison and attempted to physically transfer his documents to the Van Liews at that time. (Def. Exhibits [80] at 33). It is against prison policy to allow exchanges of items from inmate to visitor (including attorneys) because it presents a variety of security concerns. (Def. Exhibits [80] at 33). Nonparty CO Robert Warner

---

[4] Bitzan also testified that he could simply drop his mail off into one of several mail receptacles in the prison, which would then be processed by the mailroom and sent to the U.S. Postal Service. (Transcript [84] at 73). The distinction is immaterial. Bitzan admitted that he could have sent his documents through either method, and, he chose not to due to his own subjective concerns. *See* (Transcript [84] at 74) ("Could have, I guess, if I wanted to roll the dice.").

[5] The exhibit actually contains a typographical error in the body where it notes the meeting occurred on September 3, 2014. The parties agree that the visit took place on October 3, 2014.

prevented the transfer of documents and explained to both Bitzan and the Van Liews that Bitzan would need to mail his documents to them unless they made arrangements with the facility for the documents to be set out front for a visit pickup. (Def. Exhibits [80] at 33).

On November 4, 2014, Bitzan sent an email to the security director Nichols to see if Bitzan could schedule a visit with Phillip Van Liew to personally transfer his documents to Van Liew. (Def. Exhibits [80] at 123). Bitzan also inquired as to whether all three *Hamby* plaintiffs could collectively meet with the Van Liews in the same room. (Def. Exhibits [80] at 123). Nichols did not respond to the document transfer request, but indicated that a collective meeting would not be possible. (Def. Exhibits [80] at 123). She told Bitzan that his lawyers would have to call the facility to get approval for a joint meeting. (Def. Exhibits [80] at 123).

Sometime during the week of January 5, 2015, Fred Van Liew called the Warden's Office to see if he could arrange both the document transfer and collective visit. Defendant Rebecca Bowker, the executive assistant to the Warden, answered the phone. (Transcript [84] at 176); (Def. Exhibits [80] at 132). Bowker indicated that she understood the request for the collective meeting had already been denied, but referred the matter to defendant Jill Johnson, who typically coordinated offender visits and legal calls. (Def. Exhibits [80] at 132, 222). The record is unclear whether Johnson subsequently spoke with Fred Van Liew about the requests. (Compare Def. Exhibits [80] at 132 with Transcript [84] at 227-28). The record is clear that Johnson did not have the authority to grant permission for the document transfer, and in fact did not grant such permission. (Transcript [84] at 228-29).

Phillip Van Liew also called the facility sometime during the week of January 5, 2015, to get permission to take documents from Bitzan in the prison visiting room during an upcoming visit. (Transcript [89] at 11). Phillip Van Liew testified that he did not recall who he initially spoke with over the phone when he contacted the prison, but that he was eventually redirected to a man who gave Van

Liew permission to take documents directly from Bitzan at an in-person visit at the prison. (Transcript [89] at 11-12). Van Liew believed the man he spoke to was either the Warden or Assistant Warden. (Transcript [89] at 16). The record fails to establish that any of the defendants granted Van Liew permission to take documents from Bitzan, or were otherwise aware that any such permission had been granted. (Transcript [84] at 183, 216, 227).

On January 9, 2015, Phillip and Fred Van Liew went to the prison expecting that they would be meeting with Bitzan and taking Bitzan's documents from him in the visiting room. (Transcript [89] at 11). Bitzan was aware of the Van Liews' visit and shared the same understanding regarding the transfer of documents. (Transcript [84] at 42). Bitzan prepackaged his legal documents into five manila envelopes with Phillip Van Liew's name and address written on them. (Transcript [84] at 43-44). Prior to meeting with Bitzan, Van Liew met with *Hamby* co-plaintiff, Lawrence Hamby. (Transcript [84] at 148). Bitzan was called to the visiting room at approximately 11:00 a.m., while Van Liew was visiting with Hamby. (Transcript [84] at 148).

Nonparty CO Michael Chapman, one of the prison staff assigned to the visiting room that day, was not aware of any arrangement for the Van Liews to leave with Bitzan's documents. (Transcript [84] at 168). Instead, Chapman was notified by someone with authority that Bitzan had permission to drop off his legal documents at the visiting room only so that the Van Liews could review them during their meeting with Hamby, and the documents would be returned to Bitzan at the conclusion of the meeting. (Transcript [84] at 148). Chapman was likewise unaware of any plan for Bitzan to meet with Van Liew. (Transcript [84] at 148).

When Bitzan made it to the visiting room with his documents, one of the Van Liews asked Chapman if they could visit with Bitzan. (Transcript [84] at 148). Because there was a second legal visit room available, Chapman approved the visit and Bitzan was then processed into the visiting area.

(Transcript [84] at 148-49). During this process, nonparty Shift Captain Rhodes pulled Bitzan's legal documents out of the manila envelopes and thumbed through them to make sure there was no contraband. (Transcript [84] at 44). Captain Rhodes informed Bitzan that the Van Liews would not be able to leave with the documents. (Transcript [84] at 44).

Once Bitzan was processed into the visiting room, he told the Van Liews that Captain Rhodes had indicated that the Van Liews could not remove the documents from the prison. (Transcript [84] at 81). Phillip Van Liew responded by telling Chapman that he wanted to speak with Bowker or the Warden. (Transcript [84] at 81). Chapman contacted Bowker and requested her presence in the visiting room. (Transcript [84] at 151). Bowker asked Jill Johnson to accompany her to the visiting room, and Johnson agreed. (Transcript [84] at 178).

Upon Bowker and Johnson's arrival to the visiting room, Phillip Van Liew and Bowker argued about the document transfer issue. Aside from being physically present, Johnson was not involved. (Transcript [84] at 183, 225). Bowker indicated that it was against prison policy to let visitors take items from inmates outside of the visiting room unless the exchange was preapproved. (Transcript [84] at 183). Because Bowker was unaware that Phillip Van Liew had received any such approval, and the Warden (Bowker's immediate supervisor) was not at the facility at that time, she declined to let the Van Liews take Bitzan's documents. (Transcript [84] at 183, 188); (Pl. Exhibits [81] at 22). In the alternative, Bowker offered to hold the mailroom open so that Bitzan could mail his documents to Phillip Van Liew that same day. (Transcript [84] at 84, 188).

Bitzan and Phillip Van Liew agreed among themselves that Bitzan would not mail out his documents that day; rather, Bitzan would make copies of all of his documents and send the copies through the regular prison mail channels to Van Liew. (Transcript [84] at 85, 87–88). Later that same day, Bitzan sought to make copies of the documents at the prison library and charge the copying costs to the Messianic

group account. (Pl. Exhibits [81] at 22–23); (Def. Exhibits [80] at 133). Bitzan was told that he would need to obtain Schierbrock's permission to charge the copying costs to the Messianic group account. (Pl. Exhibits [81] at 22–23); (Def. Exhibits [80] at 133). It is against prison policy to allow group payment of legal costs because it can lead to various security risks. (Transcript [84] at 209–10).

On the afternoon of January 9, 2015 (Friday), Bitzan sent identical kiosk messages to defendants Schierbrock and Roberts (the Assistant Warden) asking for the Messianic group to pay for the copying costs, indicating that the three co-plaintiffs all agreed to help pay for the costs and would donate the money to the account that evening to cover the costs. (Def. Exhibits [80] at 133). On January 10, 2015, Bitzan paid over $150.00 out of his own account to have copies made of nearly all of the *Hamby* documents in his possession. (Pl. Exhibits [81] at 22–23).

On the morning of January 12, 2015 (Monday), Schierbrock responded to Bitzan's request by indicating his belief that Roberts should handle the request, since Schierbrock now was aware that he was named as a defendant in *Hamby*. (Transcript [84] at 206); (Def. Exhibits [80] at 133). Roberts approved the request later that same day, but explicitly noted that the "account balance [for the Messianic group] . . . is $11.02 and there is no provision allowing a negative balance on group accounts." (Def. Exhibits [80] at 134); *see also* (Pl. Exhibits [81] at 23) ("Roberts approved the group to collectively cover the cost of and make the copies as long as the account didn't go into the negative."). Roberts sent this message to Bitzan, Hamby, and Buck. (Def. Exhibits [80] at 46). It was uncommon to grant this type of exception. (Transcript [84] at 210).

No member of the Messianic group deposited any money into the group's account until Buck deposited $30.00 on January 30, 2015, after the account incurred a negative balance of $25.00 due to copying costs charged to the group. (Transcript [84] at 92, 207–08). On February 6, 2015, permission for the group to pay for the copying costs was rescinded in a message written by Roberts' assistant Johana

Herdrich. (Def. Exhibits [80] at 48). Roberts has no recollection of being involved in the decision to rescind permission or telling his assistant to send that message. (Transcript [84] at 218–19).

The *Hamby* defendants filed a motion for summary judgment on January 30, 2015. Though Bitzan copied his legal documents on January 10, 2015, he did not actually mail them to Van Liew until the week of February 9, 2015. (Transcript [84] at 54–55). The *Hamby* plaintiffs' deadline to file a reply was February 23, 2020. Phillip Van Liew filed a response on February 20, 2015, which was in substance a motion to dismiss the case and refile it due to Van Liew's alleged difficulty in obtaining documents from his clients. The Court granted the unresisted motion on April 3, 2015. Plaintiffs Bitzan and Buck refiled the *Hamby* case as the instant case on June 19, 2015.

## IV.    LEGAL STANDARD AND ANALYSIS

Bitzan claims that he was retaliated against by defendants because of his participation in the *Hamby* suit. Bitzan's first major contention is that the defendants retaliated against him by transferring him into investigative segregation. Bitzan also argues that he was retaliated against when he was released from investigative segregation and placed temporarily into Tier 2, a more restrictive housing tier than he had been in (Tier 3).[6]

---

[6] During the evidentiary hearing, Bitzan asserted that he was retaliated against while he was in investigative segregation by the deprivation of his religious materials and legal documents. Bitzan, however, did not raise or brief that issue in his post-trial brief. Thus, the Court deems the issue to have been waived. Even if not waived, Bitzan failed to prove that any named defendant restricted Bitzan's access to materials in the investigative segregation unit at least in part because Bitzan had filed the *Hamby* lawsuit.

As to Eisnnicher's involvement, Bitzan's claim fails insofar as it fails to even allege personal involvement in any adverse action. It is undisputed that Eisnnicher did not make property determinations. Furthermore, Eisnnicher was not a defendant in *Hamby* and thus had no reason to retaliate on that basis.

As to any determination made by Wilcox, Bitzan fails to show that he acted with retaliatory animus. While Wilcox did make determinations that Bitzan could not have certain religious items, Wilcox was merely enforcing a generally applicable rule against hardback books. *Driggers v. Cruz*, 740 F.3d 333, 336 n.2 (5th Cir. 2014) ("Instead, prison officials are only enforcing a generally applicable prison regulation; there is no evidence of any sort of retaliatory motive."). There is no evidence that Wilcox had any personal involvement in denying Bitzan any legal documents. The evidence only shows that Wilcox

Bitzan's second major contention is that the defendants retaliated against him by stymying his ability to get his *Hamby* legal documents to his attorney of record, Phillip Van Liew. Bitzan alleges that this occurred when the apparent permission granted to Van Liew to take documents directly from Bitzan was rescinded at the January 9, 2015 visit.[7]

## A.     Retaliation Claims

Bitzan bears the burden to prove his retaliation claims. "To prevail on a § 1983 claim for retaliation in violation of the First Amendment, [Bitzan] must demonstrate (1) that he engaged in a protected activity;

---

was made aware of Bitzan's issue and he responded by directing Lieutenant Clark to check the property room. Finally, like Eisnnicher, Wilcox was not a defendant in *Hamby* and thus had no motive to retaliate against Bitzan.

To the extent that Schierbrock's May 30, 2014, email denying Bitzan's request to "overturn" Wilcox's determination could meet the threshold of an adverse action, Bitzan fails to show that Schierbrock acted on a motivation to retaliate. While the evidence does show that Schierbrock was generally aware that Bitzan did or intended to file suit naming him as a defendant, and thus had a conceivable motive to retaliate, this in itself is insufficient to prove that the motivation was acted on. Instead, the evidence shows that Schierbrock was merely enforcing the same generally applicable rule that Wilcox had already enforced.

[7]During the evidentiary hearing, Bitzan argued that defendants retaliated against him when permission was rescinded for the copying costs of the legal documents to be paid by the Messianic group. Bitzan did not raise or brief this issue in his post-trial brief. Thus, the Court deems it to be waived. Even if not waived, Bitzan failed to prove that any named defendant made the rescission decision at least in part because Bitzan had filed the *Hamby* lawsuit.

With respect to Bitzan's claim regarding the February 6, 2015, decision to revoke permission for the Messianic group to pay the copying costs of the legal documents, Bitzan again fails to prove that any defendant acted with a motivation to retaliate. The evidence shows that, as a general rule, group payment of legal costs was prohibited. The evidence also shows that Roberts granted an exception to this policy on January 12, 2015. The evidence and circumstances regarding the revocation of the exception support an inference that Roberts was responsible for it.

Bitzan fails to prove that Roberts acted with retaliatory motive. As an initial matter, Roberts was not named in the *Hamby* suit and thus had no obvious motive to retaliate on that basis. Furthermore, the evidence is inconsistent with any notion that Roberts retaliated by the revocation. Roberts initially allowed an exception rarely granted in the prison for Bitzan's benefit. That he revoked the exception nearly a month later after the members failed to act on the limited grant of permission does not evince a motivation to retaliate against Bitzan, especially considering Robert's warning about the group's finances. The evidence in the record is inconsistent with any notion that Roberts retaliated against Bitzan by revoking the exception to charge copying costs to the Messianic group.

(2) that the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity; and (3) that the adverse action was motivated at least in part by the exercise of the protected activity." *Santiago v. Blair*, 707 F.3d 984, 991 (8th Cir. 2013). Bitzan may not prove his retaliation claims by generally alleging that 'the defendants' retaliated against him; rather, he must specifically prove that each individual defendant, "through the official's own individual actions" retaliated against him. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010).

Bitzan's filing of and participation in *Hamby* satisfies the protected activity element. *See Spencer v. Jackson Cty. Mo.*, 738 F.3d 907, 911 (8th Cir. 2013) ("It is well established that the right to file a legal action is protected under the First Amendment."). The undersigned also assumes that all of the alleged retaliatory actions meet the threshold of an adverse action that would chill a person of ordinary firmness from filing or participating in a lawsuit. *But see Gard v. Dooley*, No. 4:14-CV-04023-LLP, 2016 WL 5376236, at *35 (D.S.D. Mar. 4, 2016), *report and recommendation adopted*, No. CV 14-4023, 2016 WL 5390111 (D.S.D. Sept. 26, 2016) ("Even assuming a retaliatory animus, a one-time, nineteen-day delay in receiving books would not 'chill a person of ordinary firmness from continuing' in pursuing his constitutionally protected right."). Accordingly, the undersigned's analysis is confined to a determination of whether individual defendants had any personal involvement in the allegedly retaliatory acts, and if so, whether their action was motivated due to Bitzan's filing of or participation in *Hamby*.

With respect to Bitzan's claim regarding his transfer into investigative segregation, he fails to prove that any individual defendant had any personal involvement in his transfer. The evidence establishes that the responsibility for transferring Bitzan to investigative segregation rests solely on three non-parties: Captain George, CO Cangas, and the confidential informant. Bitzan does not, and indeed, cannot specify any defendant who had any personal involvement in the decision to transfer him. Instead, Bitzan offers the competing theory that 'the defendants' fabricated the confidential informant's allegation. Bitzan

principally argues that it is "quite clear" that 'the defendants' orchestrated the situation with the confidential informant based on: (1) the fact that he was placed in investigative segregation within 24 hours of Jill Johnson's email to Hamby; and (2) that the nonparty COs who transferred Bitzan to investigative segregation asked him about his blue folders. (Pl. Brief [88] at 3–4).

Neither circumstance convinces the undersigned that it is "more likely than not" that any defendant had any involvement in Bitzan's transfer. The evidence establishes that as of May 7, 2014, the only defendant with actual knowledge that the *Hamby* suit had been filed was Johnson. There is no evidence that Johnson had seen a copy of the *Hamby* complaint or had any knowledge about the nature of the lawsuit or the identity of the named defendants. There is no evidence that she told any other *Hamby* defendant of that suit after contacting the Attorney General's Office. She also had no reason to coordinate a conspiracy against Bitzan, as she was not a defendant in *Hamby*. *See Atkinson v. Bohn*, 91 F.3d 1127, 1129 (8th Cir. 1996) ("Atkinson did not allege that defendants were involved in or affected by his previous litigation, and failed to allege sufficient facts upon which a retaliatory animus could be inferred."). Nor is there any evidence in the record of such a conspiracy. Schierbrock was the only other defendant with even general awareness that Bitzan had filed or intended to file a lawsuit in which he would be named a defendant. There is no evidence to show that Schierbrock had any involvement fabricating the allegations made by the confidential informant or was otherwise involved in Cangas' report of the allegation or in George's decision to transfer Bitzan. Likewise, there is no evidence to link Schierbrock to the COs who allegedly made the hearsay statement about the blue folders to Bitzan. It is also worth noting that the hearsay statement is consistent with a garden-variety transfer to investigative segregation, given that legal documents were allowed to travel with Bitzan to investigative segregation and, as Bitzan emphasizes, he conspicuously took his blue folder full of legal documents throughout the prison. *See Taylor v. Miller*, No. 4:15 CV 285 RWS, 2017 WL 513020, at *5 (E.D. Mo. Feb. 8, 2017) ("Taylor's unsupported beliefs

. . . that because the defendants work together and know each other, they must have conspired to retaliate against him—do not create a genuine issue of fact from which a jury could find retaliatory motive.").

With respect to Bitzan's claim regarding his transfer out of investigation segregation, Bitzan fails to prove any defendant acted with a motivation to retaliate. Wilcox was the only defendant with any role in determining the population tier Bitzan was released to. Again, Wilcox had no obvious motive to retaliate against Bitzan for *Hamby* because he was not a defendant in that case. Furthermore, the evidence shows that Wilcox released Bitzan as being eligible for Tier 3 classification. There is no evidence to show that Wilcox was responsible for Bitzan's actual release into Tier 2. Even if he were, Wilcox credibly testified that it was common for Tier 3 to have a waiting list and for inmates to have to wait in Tier 2 while a cell in Tier 3 became available.

With respect to Bitzan's claim regarding the January 9, 2015, decision regarding the transfer of his documents to Van Liew, Bitzan fails to show that any defendant acted with a motivation to retaliate. Bowker is the only defendant who was substantively involved in the January 9 incident. Jill Johnson was an observer and the record fails to establish that she took any action with respect to this incident. Bowker was the only defendant who denied Bitzan the ability to transfer his documents to Van Liew. Bitzan seems to argue that there is an inference that Bowker acted in retaliation for *Hamby* because she made a last-minute decision to rescind permission previously granted to Van Liew to take Bitzan's documents. It is undisputed that the prison has a generally applicable rule against allowing defendants to transfer documents to anyone in the visiting room. The evidence also shows that this rule was subject to exceptions granted by prison administration. Finally, the evidence shows that if any permission was granted, it was not granted by Bowker, but by some unidentified male personnel at the prison.[8]

---

[8] Mr. Van Liew testified that he did not know who gave him the permission to transfer the documents in the visiting room, but he thought it was either the warden or assistant warden. Mr. Van Liew readily

Bitzan fails to prove that Bowker acted with retaliatory motive principally because he fails to prove that Bowker was aware of any prior permission granted to Van Liew. Even accepting what the Court believes to be is Bitzan's inference that Bowker's superior, the Warden, granted permission for the document transfer, there is no evidence in the record to show that the Warden informed Bowker of this decision. The evidence is consistent with a finding that Bowker was not aware of any prior permission, and was thus merely enforcing a generally applicable rule. As discussed above, enforcement of a general rule, without more, is inconsistent with a retaliatory act. That Bowker offered to hold the mailroom so that Bitzan could sent out his documents is also inconsistent with a retaliatory act.

Based on the foregoing, Bitzan fails to prove his retaliation claims against all of the defendants. To the extent that the undersigned did not discuss the involvement of particular defendants with regard to the above discussed allegedly retaliatory acts, it is because the evidence does not support their involvement. To the extent that Bitzan alleges there are other discrete acts of retaliation not discussed by the undersigned, the evidence does not support that any acts not discussed were retaliatory.[9] All defendants are entitled to judgment in their favor.

## B.     Qualified Immunity

Defendants argue that Bitzan's claims are barred under 42. U.S.C. § 1997e(e) and that they are entitled to qualified immunity. Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar

---

admitted that his recollection of the document transfer situation had dimmed with the passage of time and that was confirmed by his testimony.

[9] To the specific extent that Bitzan is claiming that DeGrange retaliated against him in some manner during DeGrange's investigation, there is no evidence to show that DeGrange did anything that would constitute an adverse act. Bitzan fails to allege what the adverse act would be.

as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The undersigned does not reach the qualified immunity issue given that Bitzan's claims fail on their merits.

## C.    Exhaustion

Defendants now argue that Bitzan's retaliation claims should be dismissed because he failed to exhaust the available grievance procedures. "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Jones v. Bock*, 549 U.S. 199, 211 (2007). The burden is on Defendants to raise and prove this affirmative defense. *Id.* at 212

Defendants never raised or briefed failure to exhaust the retaliation claims in their summary judgment motion. The Court questions whether it is proper for defendants to now argue the exhaustion issue as it relates to the retaliation claims. The Court notes that DeGrange's undisputed testimony establishes that Bitzan never filed any grievances with respect to his retaliation claims concerning the investigative segregation matter or the January 2015 document transfer incident. Bitzan made no counter argument that exhaustion was not required. Nor did Bitzan argue that he did in fact exhaust the administrative remedies with respect to his retaliation concerns. Based on the current record, it does appear that Bitzan failed to exhaust his administrative remedies. Furthermore, the Court already has opined that the merits of Bitzan's retaliation claims are fatally flawed as to each remaining defendant and that judgment should be entered in favor of each defendant.

## V.    REPORT AND RECOMMENDATION AND ORDER

After a thorough review of the evidence, the Court concludes that Bitzan has failed to meet his burden to show that any of the defendants retaliated against him for his filing of or participation in *Hamby*. The undersigned recommends entry of judgment in favor of each of the defendants and against Bitzan.

IT IS ORDERED that the parties have until **March 9, 2021,** to file written objections to the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1). *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990); *Wade for Robinson v. Callahan*, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made and must set forth the basis for such objections. See FED. R. CIV. P. 72; *Thompson*, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994); *Halpin v. Shalala*, 999 F.2d 342, 345 & n.1, 346 (8th Cir. 1993); *Thompson*, 897 F.2d at 357. If written objections are filed, the non-objecting party has to and including **March 23, 2021,** to file any response**. The Court will not be extending these deadlines.**

**IT IS SO ORDERED.**

Dated February 24, 2021.

Helen C. Adams
Chief U.S. Magistrate Judge